FILED
2019 Aug-16  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**COLONIAL PIPELINE CO., INC.**

     **Plaintiff,**

**v.**                               **CIVIL ACTION NO. _____**

**CECO PIPELINE SERVICES CO.,**     **JURY DEMAND**
**INC. and FICTITIOUS PARTIES 1 -10**

     **Defendants.**

## COMPLAINT

Plaintiff Colonial Pipeline Co., Inc. ("Colonial" or "Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendant CECO Pipeline Services Co., Inc. ("CECO" or "Defendant"), and in support thereof states the following:

### PARTIES

1.     Colonial is a Delaware and Virginia corporation with its principal place of business at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 30009.

2.     Defendant CECO is a Texas corporation with its principal place of business at 5440 Alder, Houston, Texas 77081.

3.     Fictitious Parties 1 – 10 are those entities or individuals who own or operate CECO, who performed work on Colonial's Line 01 in Shelby County, Alabama, on or about July 2015, who trained, hired, instructed, supervised, or were responsible for training, hiring, instructing, or supervising the CECO employees who performed work on Colonial's Line 01 in Shelby County, Alabama, on or about July 2015, and/or who otherwise caused or contributed to the breach of Colonial's Line 01 in September 2016.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.      CECO is subject to personal jurisdiction in Alabama as a result of its business activities in Alabama and because its negligence, breach of contract, and breach of warranty occurred in Alabama and caused damage to property located in Alabama.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a "substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in the Northern District of Alabama, Southern Division.

## FACTS

### *Colonial's Pipeline System*

7.      Colonial transports an average of 100 million gallons of refined petroleum products every day through a pipeline system of more than 5,500 miles. The pipeline system originates in Houston, Texas and terminates at the New York Harbor (the "Pipeline System").

8.      Included in the Pipeline System is a large diameter mainline pipe, referred to by Colonial as "Line 01."  Line 01 passes through Shelby County, Alabama.

9.      In initial construction of the Pipeline System, the exterior of the Line 01 was coated with a mill-applied asphalt enamel coating.

10.     Buried pipelines are coated with a material (commonly epoxy, asphalt, and/or polymers based products) to provide a protective barrier between the pipeline and corrosive elements.

2

11.     Over time, the coating can lose its effectiveness. Accordingly, pipeline operators regularly monitor their pipelines to confirm the continued effectiveness of the pipeline's coating. One method to monitor the effectiveness of the pipeline coating system is the use of a Close Internal Survey.

12.     In 2014, Colonial performed a Close Internal Survey on its Line 01. This Close Internal Survey was performed consistent with Colonial's Integrity Management Program.

13.     The 2014 Close Internal Survey revealed certain locations on Line 01 in Alabama (generally) and Shelby County (specifically) that met Colonial's criteria for recoating (the "Recoat Project").

### Colonial's Contract with CECO

14.     CECO holds itself out as a pipeline services company, as "the premier contractor for pipeline operators, providing quality natural gas and liquid pipeline construction [and] maintenance services (including coating repair)," and as performing "turn-key coating removal and recoating" services. Excerpts from the CECO website (www.tryceco.com) are attached as Exhibit A.

15.     Colonial and CECO executed a Master Services Agreement ("the CECO MSA") on January 26, 2015, that provided overall terms and conditions for the contractual relationship between Colonial and CECO. The CECO MSA is attached hereto as Exhibit B.

16.     The MSA provides, "The validity, construction, interpretation, and performance of the Agreement shall be governed by the laws of the State of Georgia, without regard to conflicts of law principles that would cause the application of the laws of another jurisdiction." *See* MSA ¶ 24, attached hereto as Exhibit B.

17.     CECO agreed pursuant to the MSA that it was and would perform all services as an independent contractor of Colonial. MSA ¶¶ 1(a), 27.

18.     The CECO MSA provides in pertinent part that, when Colonial desires CECO's services, Colonial shall issue a written "Work Authorization" that specifies the particular work to be performed. *See* CECO MSA (Ex. A) at 1. Each Work Authorization is subject to the terms and conditions of the CECO MSA. *Id.* ¶ 1(b).

19.     On May 20, 2015, Colonial issued a $3.5 million Work Authorization to CECO to provide labor, equipment and materials to perform the Recoat Project, and CECO accepted the Work Authorization. That Work Authorization is attached hereto as Exhibit C.

### *The Recoat Project*

20.     The Recoat Project was divided into segments. Each segment was assigned a number referred to as the Dig number. One such segment, "Dig 200," involved an approximately 100-foot segment of Colonial's Line 01 located between Station 5154+57 and Station 5155+62 in Shelby County, Alabama.

21.     Dig 200 was performed from on or about July 13, 2015 to on or about July 21, 2015.

22.     To perform Dig 200, CECO first located Line 01.

23.     CECO then excavated the pipeline and supported the pipeline with timber skids at 20-foot intervals.

24.     Soil conditions at the site of Dig 200 were rocky. In fact, CECO was required to remove approximately two feet of slate and dirt from below the Pipeline in order to complete the recoat project at Dig 200.

25.     CECO removed the existing coating from the pipeline in the areas between the skids and then applied new coating to those areas of the pipeline.

26.     Following recoating of the segments between the skids, CECO then placed additional skids in the recoated section and removed the initial skids.

27.     CECO then removed the coating from the pipeline at the locations of the initial skids and recoated those areas.

28.     Following application of the recoating material to the pipeline surface, CECO wrapped Line 01 with rock shield.

29.     CECO then backfilled the excavation area, including the excavation beneath the pipeline.

30.     The backfill material consisted of native soil.

31.     At the time of Dig 200, no wrinkle or other anomalies were identified on the segment of the pipeline involved in Dig 200.

32.     As part of this backfill process, CECO should have employed compaction techniques to achieve adequate compaction of the newly placed soil beneath the pipeline so that the pipeline could not compress the soil and deflect downward.

33.     Also as part of this backfill process, CECO should have placed the material used for backfill in 6 inch lifts and should have compacted the material between each lift.

34.     As part of the backfill process, CECO also should have examined the material used for the backfill to determine if the material was adequate to provide proper support for the pipeline.

35.     However, as Colonial would later discover, CECO negligently performed the services it was obligated to provide during Dig 200 and the Recoat Project.

*The Subject Event*

36.     On September 9, 2016, an inspector with the Alabama Surface Mining Commission discovered a gasoline release approximately nine miles upstream of Colonial's Pelham Junction tank farm in Shelby County, Alabama, near County Road 91 (the "CR-91 Event").

37.     Within minutes of discovery of the CR-91 Event, Colonial commenced shutdown of Line 01.

38.     From on or around September 13, 2016 to September 17, 2016, Colonial installed stopple fittings, performed nitrogen injections, and conducted other necessary actions to safely displace product from the length of Line 01 that was believed to contain the failed segment of the pipe that was the source of the CR-91 Event (the "Affected Segment").

39.     On September 20, 2016, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") approved Colonial's installation of a 500-foot bypass (the "Bypass") to safely divert product around the portion of the pipeline containing the Affected Segment.

40.     By September 22, 2016, the Bypass was operational and the transportation of gasoline along Colonial's Line 01 recommenced through the Bypass subject to a PHMSA imposed pressure restriction.

41.     As a result of the CR-91 Event, Colonial has suffered damages arising from and/or including, but not limited to, physical damage and repair to the pipeline, interruption in service and lost income, damage to and remediation of the surrounding land and environment, emergency response costs, and other losses and damages arising from CECO's work and/or CECO's negligence.

*The Cause of the CR-91 Event*

42.     On or around September 28, 2016, Colonial excavated Line 01 to reveal the Affected Segment.

43.     Excavation of the Affected Segment quickly revealed (1) a "wrinkle" in the pipeline's exterior and (2) a six- to seven-inch gap between the bottom of the pipeline and the underlying soil. The wrinkle is shown below in Figures A.1 and A.2. The gap is shown below in Figure B.




*Figure A.1*                                                    *Figure A.2*



*Figure B*

44.    The wrinkle (as shown in Figures A.1 and A.2) was caused by the pipeline being placed into a state of free span, whereby it lacked adequate support from the soil beneath the pipeline. This free span state caused axial stresses along the top of the pipeline that eventually resulted in the wrinkle forming. The gap (as shown in Figure B) was a further indication of the free span condition caused by the drastically insufficient backfill of soil under Line 01.

45.    A 116-foot-long section of Line 01 was removed for additional inspection, as shown in Figure C.



*Figure C*

46.     Of the 116-foot-long section, an approximate twenty-foot long section containing the Affected Segment containing the wrinkle (the "Pipe Section") was transported to a third party for metallurgical analysis.

47.     The third-party metallurgical evaluator (the "Evaluator") noted upon visual inspection the 180-degree wrinkle in the middle of the Pipe Section.

48.    At the wrinkle location, the pipeline's external coating was disbonded and cracked, as indicated in Figures D.1 and D.2, below:



*Figure D.1*



*Figure D.2*

49.     The Evaluator noted that such cracking in the coating is associated with pipeline wrinkle strains and concluded that such wrinkle formed after the 2015 Recoat Project.

50.     The Evaluator removed the external coating from the segment of the Pipe Section containing the wrinkle, which revealed a circumferential through-wall crack at the wrinkle peak (as shown in Figure E, below).



*Figure E*

51.     The metallurgical analysis concluded that the through-wall crack was the source of the CR-91 Event.

52.     As a result of the CR-91 Event, PHMSA issued a Corrective Action Order and, later, an Amended Corrective Action Order requiring Colonial to have a root cause failure analysis conducted by an independent third party to identify the technical root cause of the CR-91 Event.

53.     The root cause failure analysis concluded that the technical root cause of the CR-91 Event was inadequate soil consolidation under Line 01 during the 2015 Recoat Project.

54.     Thus, according to the third-party metallurgical analysis and third-party root cause failure analysis, the soil under Line 01 was not adequately backfilled and/or not adequately compacted during the Recoat project to provide the pipeline with sufficient support to avoid vertical deflection. As a result, Line 01 was placed in a state of free span, allowing the pipeline to deflect downward—causing the pipe to wrinkle and then crack, which resulted in the CR-91 Event.

55.     Importantly, the third-party metallurgical and root cause failure analyses also confirmed that Line 01 settled and the wrinkle formed soon after CECO completed Dig 200 as part of the Recoat Project.

56.     The through-wall-crack on the crest of the wrinkle formed on or about September 8, 2016; Colonial discovered the release on September 9, 2016.

## COUNT I

## NEGLIGENCE AGAINST CECO

57.     Colonial incorporates the preceding paragraphs as though they were fully set forth herein.

58.     CECO had a duty to perform its services relevant to Dig 200 and the Recoat Project with reasonable care.

59.     CECO holds itself out to specialize in "all aspects of pipeline integrity work," providing "crews that are safe and productive," specifically for "major recoat projects."

60.     CECO claims to have "extensive experience coating pipe." In fact, CECO states that it "understand[s] that when [a] pipeline is exposed, [the pipeline operates] under reduced

pressure and limitations," and therefore CECO "get[s] in and get[s] out quickly – all the while conducting [its] business in a safe manner."

61. CECO touts its "programs […] developed to promote a safe working environment for customers, employees, the public and the environment."

62. CECO claims to "invest in [its] employees through enhanced training to increase skills and cross-functionality" and "assures a safe and productive work environment."

63. CECO vows that it will:

a. "Communicate to each customer, supervisor, employee, and sub-contractor his/her safety responsibilities and regularly measure safety performance";

b. "Adhere fully with all applicable safety and environmental laws/regulations";

c. "Operate [its] business using the sound safety practices necessary to protect personnel, property and the environment";

d. "Conduct JSA (Job Safety Analysis) assessments before starting a new activity, make all personnel aware of potential hazards, and provide controls to minimize or eliminate [sic] risks";

e. "Ensure training is provided to protect our employees, the environment, property and the public";

f. "Retain professional staff to support Environmental, Health and Safety activities"; and

g. "Evaluate and report safety performance for continuous improvement."

64. However, CECO breached its duty of care during Dig 200 and the Recoat Project by, *inter alia*:

a. failing to comply with Colonial's Excavation and Backfill Procedure, specifically but not including to the following failures:

i. failing to provide input and assistance with the development of, to implement, to review, and to modify as necessary the Site Specific Excavation and Backfill Plan, or negligently performing such duties;

ii. failing to ensure appropriate backfill soil mixture in order to obtain proper soil compaction below Line 01, or negligently performing such duty;

    iii.   failing to consider land slope, proximity to road, potential for heavy equipment traffic above Line 01, and other related considerations regarding backfill, or negligently performing such duties;

    iv.   failing to utilize appropriate equipment to properly backfill under Line 01, or negligently performing such duty;

    v.   failing to conduct special monitoring of backfill and/or to require implementation of pipe support compaction plan, given length of excavation, or negligently performing such duties;

    vi.   failing to install backfill material using 6-inch lifts, or negligently performing such duties;

    vii.   failing to ensure soil was equally placed along both sides of Line 01 and properly compacted until Line 01 was covered, or negligently performing such duties;

    viii.   failing to ensure permanent pipeline support and backfill material was implemented, or negligently performing such duties; and

    ix.   failing to consider factors contributing to soil stability and to exercise caution in the backfill process to account for such factors, or negligently performing such duties;

b.   failing to comply with CECO's own publicized or internal policies, rules, guidelines, practices, or standards, including but not limited to the following failures outlined in this Complaint:

    i.   failing to exhibit expertise in "all aspects of pipeline integrity work" or negligently performing such duty;

    ii.   failing to provide "crews that are safe and productive," specifically for a "major recoat project[t]" or negligently performing such duty;

    iii.   failing to "conduct [Dig 200 and the Recoat Project] in a safe manner" or negligently performing such duty;

    iv.   failing to implement and comply with "programs […] developed to promote a safe working environment for customers, employees, the public and the environment" or negligently performing such duties;

    v.   failing to provide "enhanced [employee] training to increase skills and cross-functionality" in preparation for Dig 200 and the Recoat Project, or negligently performing such duties;

    vi.   failing to "assur[e] a safe and productive work environment" or negligently performing such duty;

vii.   failing to "[c]ommunicate to each customer, supervisor, employee, and sub-contractor his/her safety responsibilities and regularly measure safety performance" or negligently performing such duties;

viii.   failing to "[o]perate [during Dig 200 and the Recoat Project] using the sound safety practices necessary to protect personnel, property and the environment" or negligently performing such duties;

ix.   failing to "[e]nsure training [was] provided [prior to Dig 200 and the Recoat Project] to protect […] employees, the environment, property and the public" or negligently performing such duties;

x.   failing to "[r]etain professional staff to support Environmental, Health and Safety activities" or negligently performing such duty;

xi.   failing to "[e]valuate and report safety performance" during Dig 200 and the Recoat Project or negligently performing such duties;

c.   failing to carry out Dig 200 and the Recoat Project with reasonable care, including but not limited to the following failures:

i.   failing to properly assess the pipeline site(s) in order to identify procedures and techniques necessary to ensure successful performance of Dig 200 and the Recoat Project, or negligently performing such duties;

ii.   failing to set minimum soil compaction limits appropriate for backfill of Line 01, or negligently performing such duties;

iii.   failing to implement techniques sufficient to achieve minimum soil compaction limits appropriate for backfill of Line 01, or negligently performing such duties;

iv.   failing to appropriately backfill Line 01 in order to provide Line 01 with adequate support to prevent vertical deflection of the pipeline, or negligently performing such duties; and

v.   failing to inspect, test or otherwise appropriately examine the soil under and around Line 01 following backfill to confirm minimum compaction limits were met and would be sustained, or negligently performing such duties; and

d.   otherwise acting or omitting to act in additional ways that left the pipeline compromised and vulnerable to settlement, breach, and release, all of which may be revealed during discovery of this action.

65.   As a direct and proximate cause of CECO's negligence, Colonial suffered and is entitled to recover damages, including but not limited to those set forth above.

## COUNT II

### WANTONNESS AGAINST CECO

66.     Colonial incorporates the preceding paragraphs as though they were fully set forth herein.

67.     CECO knew at the time of Dig 200 that if CECO failed to adequately backfill the pipeline, the pipeline would likely fail, the failure would likely result in a release of gasoline, and the release would likely cause significant harm to Colonial.

68.     CECO acted with reckless indifference to the consequences of its actions by consciously and intentionally failing to perform the backfill process in all of the ways described herein, including but not limited to those acts and omissions outlined in paragraphs 58 through 65 of this Complaint.

## COUNT III

### CONTRACTUAL INDEMNITY AGAINST CECO

69.     Colonial incorporates the preceding paragraphs as though they were fully set forth herein.

70.     Georgia substantive law applies to Colonial's contractual indemnity claim against CECO.

71.     The CECO MSA is a valid contract.

72.     In the CECO MSA, CECO agreed to "defend, protect, indemnify and save and hold [Colonial] harmless" from and against "all claims, demands, costs, damages, expenses, liabilities and causes of action of every kind and character" arising out of or in any way incident to CECO's services or work performed pursuant to the CECO MSA, limited only to the extent

that Colonial is negligent, grossly negligent, or exhibits wanton or willful misconduct that directly contributes to the claimed harm. *See* CECO MSA (Ex. A) ¶ 16.

73.    As stated generally herein, and specifically in paragraphs 46 through 55 of this Complaint, the third-party metallurgical analysis and third-party root cause failure analysis confirm that the soil under Line 01 was not adequately backfilled or compacted in order to provide the pipeline with sufficient vertical support. As a result, Line 01 was placed in a state of free span—causing the pipe to wrinkle and then crack, which resulted in the CR-91 Event and caused Colonial to suffer significant damages.

74.    Also as stated generally herein, and specifically in paragraphs 54 through 55 of this Complaint, the third-party analyses further confirm that Line 01 settled, and the wrinkle formed, soon after Dig 200 and the Recoat Project was completed.

75.    CECO was contractually obligated to perform services to accomplish Dig 200 and the Recoat Project, pursuant to the CECO MSA and related Work Authorization. *See* Ex. B and Ex. C.

76.    Thus, Colonial's damages arose out of or were incident to CECO's services or work performed pursuant to the CECO MSA.

77.    As a result, CECO is liable to Colonial for the amount of Colonial's damages arising from the CR-91 Event pursuant to contractual indemnity.

<u>COUNT IV</u>

**BREACH OF EXPRESS WARRANTY AGAINST CECO**

78.    Colonial incorporates the preceding paragraphs as though they were fully set forth herein.

79. Georgia substantive law applies to Colonial's breach of express warranty claim against CECO.

80. CECO agreed to the following express warranty:

> [CECO] warrants that the Services shall be performed in a good and workmanlike manner, in conformance with the applicable industry standards, specifications and drawings as provided by [Colonial], free from defects, in compliance with all applicable laws, rules and regulations, for a period of one (1) year after completion of the Services (the "Warranty Period"). [Colonial]'s acceptance of the Services shall not relieve [CECO] of its warranty obligations. [Colonial] shall notify [CECO] if any Services are found to be defective before the expiration of the Warranty Period, and [Colonial] shall reperform the defective Services at its sole expense. If reperformance of the Services are found to be defective, then [Colonial] at its sole option may reperform any defective Services at [CECO]'s expense.

*See* CECO MSA (Ex. A) ¶ 1A.

81. Generally, CECO breached its express warranty by failing to perform Dig 200 and the Recoat Project in a good and workmanlike manner, by failing to conform with applicable industry standards and specifications relevant to CECO's work on Dig 200 and the Recoat Project, and by failing to perform work on Dig 200 and the Recoat Project that was free from defect.

82. Specifically, CECO breached its express warranty in all of the ways described herein, including but not limited to those acts and omissions outlined in paragraphs 58 through 65 of this Complaint.

83. CECO rendered its Services on Dig 200 from on or around July 13, 2015 to July 21, 2015. Because CECO insufficiently performed those Services, the pipeline deflected and wrinkled within the one-year Warranty Period set forth in CECO's MSA. *See* CECO MSA (Ex. B) ¶ 1A.

84.     Colonial issued to CECO written notice of a potential breach of warranty claim on March 15, 2017.

85.     As a direct and proximate cause of CECO's breach of the CECO MSA's Express Warranty, Colonial suffered and is entitled to recover damages including but not limited to those set forth above.

**COUNT V**

**BREACH OF CONTRACT AGAINST CECO**

86.     Colonial incorporates the preceding paragraphs as though they were fully set forth herein.

87.     Georgia substantive law applies to Colonial's breach of contract claim against CECO.

88.     The CECO MSA (along with the related Work Authorization for Dig 200 and the Recoat Project) is a valid contract between CECO and Colonial. *See generally*, Ex. B and Ex. C.

89.     In the MSA, CECO agreed:

a.   To perform all work "in accordance with sound industry practices and applicable standards";

b.   To "comply with all rules and regulations of [Colonial] and any instructions of [Colonial] as regards Contractor's presence upon said property";

c.   That "[a]ll services performed pursuant to a Work Authorization shall be performed by employees of Contractor (which Contractor shall hire, fire and supervise in its discretion) who are experienced and highly skilled in their profession and in accordance with the highest standards of professionalism and workmanship in their profession"; and

d.   To "maintain safety standards in performance of this Agreement that adhere to the highest industry norms …."

*See* CECO MSA (Ex. B) ¶¶ 12, 17, 22.

90.    CECO's acts and omissions outlined throughout this Complaint and specifically stated in paragraphs 58 through 65 amounted to CECO's breach of all of its contractual duties listed above.

91.    Additionally, CECO breached its contractual duties by committing other acts or omissions to be revealed during the course of discovery.

92.    CECO is liable to Colonial for all "damage and/or injury of whatsoever nature or kind, that arises out of or is in any way incident to or arising out of or claimed or alleged to have arisen out of the negligence, gross, negligence, or wanton or willful misconduct of [CECO] or its employees, agents or subcontractors" in the performance of CECO's services authorized under the CECO MSA and related work authorizations. *See* CECO MSA (Ex. B) at ¶ 16.

93.    The CR-91 Event resulted from CECO's breach of the CECO MSA and related Work Authorization, as asserted herein.

94.    Thus, as a direct and proximate cause of CECO's breaches of contract, Colonial suffered and is entitled to recover damages incurred in the CR-91 Event, including but not limited to those set forth above.

<u>**COUNT VI**</u>

**RES IPSA LOQUITUR**

95.    Colonial incorporates the preceding paragraphs as though they were fully set forth herein.

96.    The CR-91 Event would not have occurred had CECO exercised a reasonable degree of care during Dig 200 and the Recoat Project as outlined in Count I and throughout this Complaint.

97.     CECO exercised exclusive control over the manner and method of the backfill process.

98.     The CR-91 Event could not have occurred in the absence of the negligent performance of the backfill process.

99.     Colonial's injuries resulted from the accident.

100.    Thus, CECO's negligence is inferred under the doctrine of *res ipsa loquitur*.

101.    Colonial's damages were a direct and proximate cause of CECO's negligence. Therefore, Colonial pleads and alleges all benefits and protections arising from the doctrine of *res ipsa loquitur*.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Colonial Pipeline Co., Inc. has suffered damages arising from and/or including, but not limited to, physical damage and repair to the pipeline, interruption in service and lost income, damage to and remediation of the surrounding land and environment, emergency response costs, and other losses and damages arising from CECO's work and/or CECO's negligence, all of which are recoverable under the common law and/or the MSA. Accordingly, Colonial respectfully requests that this Court enter judgment in its favor and against Defendants CECO Pipeline Services Co., Inc. in an amount in excess of $75,000 to be determined at trial, together with pre-judgment and post-judgment interest and attorneys' fees, and any other relief deemed just and proper.

DATED this the 16th day of August, 2019.

Respectfully submitted,

COLONIAL PIPELINE CO., INC.

By: /s/ Alan D. Mathis
Alan Mathis (Ala. Bar # ASB-8922-A59M)
*One of the Attorneys for Plaintiff Colonial*
*Pipeline Co., Inc.*

OF COUNSEL:
BUTLER SNOW LLP
1819 Fifth Avenue North
One Federal Place, Suite 1000
Birmingham, Alabama 35203
(P) 205-297-2200
(F) 205-297-2201
(E) alan.mathis@butlersnow.com